Anthony J. Nunes (SBN 290224)
Nunes Law Group, APC
15260 Ventura Blvd, Suite 1200
Sherman Oaks, CA 91403
Telephone: (855) 422-5529
Fax: 424-252-4301
tony@nunesworkerrightslaw.com

Attorneys for Plaintiffs ANTHONY GREGG, SHAWN CLAIBORNE, and
WALLID SAAD, on behalf of themselves and all others similarly situated

# UNITED STATE DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY GREGG, SHAWN CLAIBORNE, and WALLID SAAD, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> BOHEMIAN CLUB, a California non-profit corporation, POMELLA LLC, a California corporation, and MONASTERY CAMP, and DOES 1-10, <br><br> Defendants. | Case No. 3:23-CV-2760 <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> 1. Failure to Pay Minimum Wage <br> 2. Collective Action - Violation of the Fair Labor Standards Act ("FLSA," 29 U.S.C. 201, et seq.) <br> 3. Failure to Provide Meal Periods <br> 4. Failure to Provide Paid Rest Breaks <br> 5. Failure to Pay All Wages at Termination (Labor Code Section 201-203) <br> 6. Failure to Provide Accurate Wage Statements <br> 7. Unfair Business Practices <br> 8. Violation of Labor Code Section 2699 (PAGA) <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs ANTHONY GREGG, SHAWN CLAIBORNE, and WALLID SAAD ("Plaintiffs"), on behalf of themselves and all others similarly situated allege, causes of action against Defendants, as follows:

## I.

## __INTRODUCTION__

1.    This is an action brought on behalf of a class of current and former employees for BOHEMIAN CLUB, POMELLA LLC, and MONASTERY CAMP (hereinafter "Defendants").

2.    Defendants violated the U.S. Fair Labor Standards Act, California's Labor Code, and California Industrial Welfare Commission ("IWC") Wage Order No. 5-2001, as amended ("Wage Order No. 5") which includes:

    a.    Failing to pay its employees minimum wage as required by federal and California law for every hour worked;

    b.    Failing to pay its employees proper overtime wages as required by federal and California law for every hour worked'

    c.    Failing to pay its employees premium wages for missed meal periods;

    d.    Failing to pay its employees premium wages for missed rest periods;

e.      Failing to maintain accurate employment records for its

employees in California; and

f.      Failing to pay its employees amounts owed at the end of

employment.

3.      Plaintiffs, on behalf of themselves and the proposed class seek

unpaid wages and penalties for California and federal Labor Code violations.

## II.

## JURISDICTION

4.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §

1331 and 29 U.S.C. § 206(a)(1).

5.      Federal jurisdiction is proper due to Defendants' violations of the

minimum wage provision of the U.S. Fair Labor Standards Act.  29 U.S.C. §

206(a)(1).  As described herein, Plaintiffs allege Defendants failed to pay wages

for off-the-clock work.

6.      Plaintiffs allege that Defendants systematically violate the Fair Labor

Standards Act by failing to provide Plaintiffs and other class members minimum

wage for all hours worked.

7.      Venue lies within the Northern California District because Defendant

Bohemian Club, Pomella LLC, and Monastery Camp are all headquartered in the

Northern District of California, in San Francisco, Alameda, and Sonoma Counties respectively.

### III.

### PARTIES

**Plaintiffs**

8.      Plaintiffs were employed by Defendants in Northern California as "Valets" and provided Defendants' members and guests with food, drinks, and hospitality services.

9.      Plaintiff Anthony Gregg was employed as a Valet for Defendant Bohemian Camp and Defendant Monastery Camp from approximately June 2006 to July 2022.

10.     Plaintiff Shawn Granger was employed as a Valet for three of Defendant Bohemian Club's camps from June 2010 to July 2022.  He started at the "Last Chance" camp in 2010.  Then moved to the "Camels Camp."  In 2018, Plaintiff Granger began working at the Monastery Camp.

11.     Plaintiff Wallid Saad was employed as a Valet for multiple Defendant Bohemian Club's camps.  Plaintiff Saad switched camps to work at the Monastery Camp and worked there from 2015 to 2022.

12.     For the purposes of this Complaint, "off-the-clock" work means work performed that was not reported or paid on any timesheets.  Consequently,

this work was either left unpaid or only partially paid via "under-the-table"

directly from Bohemian Grove camps.

13.     For the purposes of this Complaint, "under-the-table" is defined as

the payments Bohemian Grove class members receive directly from their camps.

14.     Defendant's under-the-table payments were not subject to payroll

taxes/deductions or worker's compensation insurance.

15.     Plaintiffs allege that valets worked 7 days a week, and approximately

15+ hours a day for the duration of the 2019, 2021, and 2022 camps.

16.     In 2022, Plaintiff Saad alleges that he and another Monastery Camp

valet worked entirely off-the-clock and received 100% of their pay under-the-

table.

17.     Plaintiffs were told by Defendants' Camp Captains not to record

their actual hours work, but to only report 8 hours per day, up to a maximum of

40 hours per week on their timesheets for Defendant Pomella LLC.

18.     Plaintiffs would then be paid under-the-table from Defendant

Monastery Camp for part of the remainder of their owned wages.

**Defendants**

19.     Plaintiffs allege that Defendant BOHEMIAN CLUB (hereinafter

"Bohemian Club" or "Club") operates the "Bohemian Grove" in Monte Rio,

California.

20.    Plaintiffs allege that Defendant Bohemian Club's funding for events and services at the Bohemian Grove camps is the primary reason why many camp members maintain their membership with the Bohemian Club.

21.    Plaintiffs allege Defendant Bohemian Club and the Bohemian Grove camps, such as Defendant Monastery Camp, operate as a joint venture.

22.    Defendant Bohemian Club's operations migrate from San Francisco to Monte Rio every summer for the Club's three major annual events ("Spring Jinx," "Spring Picnic," and "Summer Encampment").

23.    Payments from Defendant Bohemian Club members entitle Club members and their guests to attend the events at the Bohemian Grove.

24.    Plaintiffs allege that Defendant Bohemian Club receives payments from each individual camp for the items and services that camp attendees use during the Club events.  Finances from the Bohemian Club and the camps are highly intertwined.  Defendant Bohemian Club directly financially benefits from services provided by the Defendant Monastery Camp and other Bohemian Grove camps.

25.    Most years Defendant Monastery Camp operates at a significant loss. Plaintiffs allege that the goal of the Bohemian Grove camps is not to make a profit, but to benefit Defendant Bohemian Club and maintain the Club's elite membership.

26.    Defendant Bohemian Club finances are inseparable from its Bohemian Grove camps.  Bohemian Club members and guests from the 100+ camps pay dues to the Club.  For example, members utilized the Club's "Dining Circle" at the Grove, the cost of which is charged by Defendant Bohemian Club back to the individual camps.

27.    Plaintiffs allege that when a Bohemian Grove camp member has a guest at their camp, the camp charges a "guest fee" (approximately $900 for a weekend day, $250 for weekdays).  This fee is charged by the camps, but 100% goes to Defendant Bohemian Club.

28.    The Bohemian Grove campus is split into more than 100 camps. Each camp has one or more "Camp Captains" that are in charge of food, drinks, accommodations, and finances at their camp.

29.    Plaintiffs allege that Defendant Monastery Camp is not incorporated as a business, but as an unincorporated "association of gentlemen."

30.    Plaintiffs allege on information and belief that Defendant Bohemian Club's other camps are also not incorporated as a business or legal entity, despite the camps reliance on valet employees.

31.    Plaintiffs and other valets work for unincorporated Bohemian Club camps.  These unincorporated Bohemian Club camps collect hundreds of

thousands of dollars in member dues, and hire, fire, pay, and dictate nearly every aspect of their valets' employment.

32.    Defendant Bohemian Club is aware that camps are not legal entities, but their camps are employing valets to work off-the-clock and being paid under-the-table.

33.    Defendant Monastery Camp is one of the most prestigious and well-known camps at Bohemian Grove.  Monastery Camp attendees include Bohemian Club members that are executives of Fortune 500 companies and prominent government officials.

34.    Defendant Bohemian Club's Treasurer William "Bill" Dawson was also the Captain of the Monastery Camp and personally directed Plaintiffs to falsify payroll records and to work off-the-clock.

35.    Defendants' camp valets fit into two categories (camps using "Bolt Staffing" and camps utilizing another catering/hospitality service).

36.    Defendant Bohemian Club is aware that many camps do not use Bolt Staffing and have extra employment terms and conditions for camps not using Bolt Staffing.

37.    The majority of Bohemian Club camps use Bolt Staffing for their catering/hospitality services.

38.     Defendant Bohemian Club exercises greater control over essential terms and conditions of employment for the camps choosing not to use Bolt Staffing.

39.     Camps that do not use Bolt Staffing must seek approval from Defendant Bohemian Club regarding who can work for the camps to provide their catering/hospitality services.

40.     Defendant Bohemian Club governs the manner of work performed by the camp valets.

41.     Plaintiffs allege Defendant Bohemian Club vets class members because the camps include many high-profile attendees.  Due to the high-profile guests and potential for public scrutiny, Bohemian Club carefully monitors and places conditions on who is employed at each camp.

42.     Plaintiffs allege Defendant Bohemian Club's General Manager requires that each camp not using Bolt Staffing must send payroll documents to the Club in order for the valet to be approved to work at a camp.

43.     Plaintiffs allege Defendant Bohemian Club requires camps to send the Club's General Manager payroll forms in order to run background checks and vet class members.

44.     Plaintiffs allege that Defendant's attorneys offer guidance to the camps for how to adhere to California labor laws.  For example, Plaintiffs allege

that Camp Captains for Defendants received emails in 2021 with labor law guidance for the camps that were not using Bolt Staffing.

45.    Plaintiffs allege Defendant Bohemian Club's Captains for camps that were not using Bolt Staffing received an email on May 19, 2021, stating: "Dear Camp Captain: This communication is for Camps that are not using Bolt. . . . If you are going to use a catering company or other business entity through some company other than Bolt, we understand you will need to demonstrate compliance."

46.    In response to this email, Defendant Bohemian Club's Treasurer William Dawson pointed out that Defendant Pomella LLC will be running payroll for Defendant Monastery Camp, and that Pomella LLC already provides valets to other Bohemian Grove camps.

47.    Defendant Bohemian Club micromanages the work and non-work hours for class members.

48.    Plaintiffs allege that Defendant Bohemian Club governs the mean, manner, and method of work for camp valets.  For example, Defendant Bohemian Club's "Rules for Contractors and Camp Employees," include requirement for class members such as: "Camp employees and other contractors may not work in or visit the camp of a member who is a blood relative." . . .  " Camp employees and other contractors may use [Civic Center Phones] on a limited basis, either

before 9:00 AM or after 9 PM.  Conversations must not exceed 5 minutes in duration and camp employees must give priority to member and guest usage of the phones."

49.    Defendant Bohemian Club further micromanages the essential terms and conditions of the class members, and even controls the type of compensation class members can receive.

50.    Defendant Bohemian Club's Rules prohibits class members from accepting any compensation in the form of tips.

51.    Defendant Bohemian Club's Rules also prohibits class members from attending "rehearsals, plays, speeches, or any performances."

52.    Defendant Monastery Camp worked with Defendant Pomella LLC and its owner Mica Talmor (hereinafter "Talmor") to operate two separate methods of paying employees.

53.    Plaintiffs were directed by Defendant Bohemian Club's Treasurer Dawson to submit false timesheets to Pomella LLC showing 8.0 "regular" hours, but to not include any overtime.  These timesheets nearly always listed exactly 8.0 hours per day for 5 days a week.

54.    Defendant Pomella LLC provides valets to Defendant Monastery Camp, the Silverado Squatters Camp, and possibly other Bohemian Grove camps.

55.     Defendant Pomella LLC was aware that the timesheets radically understate Plaintiffs' actual hours worked.

56.     Pomella LLC's contract with the Monastery Camp included a requirement for Defendant Bohemian Club be included as insured on Pomella LLC's general liability insurance policy.

57.     Defendant Bohemian Club benefits from members and guests whose main interaction with the Club is to attend Bohemian Grove's three major annual events (Spring Jinx, Spring Picnic, and Summer Encampment).

58.     Plaintiffs believe that Defendant Bohemian Club will likely attempt to shield itself from legal liability by asserting that the camps operate autonomously.  In reality, the camps are not independent legal entities making their own hiring decision, but a part of a joint venture designed by Bohemian Club.

59.     Defendant Bohemian Club is responsible for putting on the camp's events.  For example, Defendant Bohemian Club creates an annual "Program of Event" for the Summer Encampment.  The program lists Defendant Bohemian Club's Board of Directors and is copyrighted by the Bohemian Club.

60.     Plaintiffs' counsel made several attempts to request information from attorneys for the Bohemian Club as well as the Monastery Camp regarding the

name of any legal entity they contend would be responsible for any alleged labor law violations at the Monastery Camp.

61.    Counsel for both the Bohemian Club and the Monastery Camp denied that Plaintiffs worked for them and did not to provide any information regarding who they contend employed Plaintiffs.

62.    The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued here in as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sues Defendants by such fictitious names.  Plaintiffs are informed and believe, and based thereon allege, that Defendants designated herein as DOE(S) are legally responsible in some manner for the unlawful acts referred to herein.

63.    Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of the Defendants designated hereinafter as DOE(S) when such identities become known.

64.    Plaintiffs are informed and believe that at all relevant times each Defendant, directly or indirectly, or through agents or other persons, employed Plaintiffs and the other class members, and exercised control over the wages, hours, and working conditions of Plaintiffs and the other class members.

65.    Plaintiffs are informed and believe and thereon allege that, at all relevant times, each Defendant was the principal, agent, partner, joint venturer,

officer, director, controlling shareholder, subsidiary, affiliate, parent corporation,

successor in interest and/or predecessor in interest of some or all of the other

Defendants, and was engaged with some or all of the other Defendants in a joint

enterprise for profit, and bore such other relationships to other Defendants so as

to be liable for their conduct with respect to the matters alleged below.

66.    Plaintiffs are informed and believe and thereon allege that each

Defendant acted pursuant to and within the scope of the relationships alleged

above, that each Defendant knew or should have known about, authorized,

ratified, adopted, approved, controlled, aided and abetted the conduct of all other

Defendants.

## IV.
## GENERAL ALLEGATIONS

67.    In 2018, Defendant Monastery Camp had no viable option for

payroll processing.  Consequently, every valet was paid under-the-table from

Monastery Camp.

68.    In 2019, Monastery Camp searched for a company to hire and

process payroll for their valets.

69.    Defendant Bohemian Club's Treasurer Dawson reached out to a

camp member who owns an automobile racing company.  Plaintiffs allege

Treasurer Dawson asked the owner if he could process the camp's payroll

through the racing company's payroll system.  Initially, the automobile racing

company's owner agreed to hire the employes and run the payroll, but later

declined.

70.     In April 2019, Defendant Bohemian Club Treasurer Dawson brought

in Defendant Pomella LLC to run the Monastery Camp's payroll, after the

automobile racing company decline to run the camp's payroll.

71.     Defendant Pomella LLC was already providing valets for at least one

other adjacent Bohemian Grove camp ("Silverado Squatters").

72.     In May 2019, Pomella LLC "hired" the same four valets that in 2018

were being paid 100% under-the-table by the Monastery Camp.

73.     Defendants were aware that Plaintiffs were working off-the-clock.

74.     Plaintiff Gregg alleges he texted Defendant Bohemian Club's

Treasurer Dawson: "[W]hen the valets filled out their time cards, I had them write

in only "short days."  She [Talmor] asked if our schedule changed and I said yes.

We did work 15-17 hrs a day (happily), but I feel that [Talmor] doesn't need to

know this.  This will only encourage her to continue to push for another valet and

increase the tax burden."

75.     In 2020, the Camp was cancelled due to COVID-19.

76.     Going into 2021 summer events, Defendants continually worked

together to come up with methods to avoid paying payroll taxes and overtime.

77.    Defendant Bohemian Club exercised substantial, direct, and immediate control over the camp valet's essential terms and conditions of employment.

78.    Defendant Bohemian Club's General Manager asked Bohemian Club Treasurer Dawson to provide payroll forms for each valet not employed through Bolt Staffing as a condition of their employment.  Defendant Bohemian Club required all valets be vaccinated against Covid-19 in order to work for a camp.

79.    In a May 22, 2021 email from Plaintiff Gregg to Defendant Bohemian Club's Treasurer Dawson, Plaintiff wrote "I appreciate [Talmor] thinking about CA labor code. However, [Plaintiff Granger] worked 21 days in a row in 2019 without a day off and it wasn't an issue.  Payroll was processed through [Talmor] and we reported a "pass sniff test" amount of overtime which [Talmor] didn't question"

80.    Additionally, on May 29, 2021, Plaintiff Gregg texted a camp captain that, "I just don't want to lose valets mid session because they are working so much without knowing what they are getting into."  The camp captain replied stating that all pay for one valet would be "under the table."

81.    Defendant Bohemian Club's camp captains, members, and guests are aware that valets are working almost nonstop.  A 2021 Guide to the Monastery Camp explains how the camp works and includes highly irreverent, comical

biographies of each camp guest.  The Guide states that "[Plaintiff]'s job is to feed us morning, noon and night."

82.     The Guide requests that guests do not further burden overworked staff by asking them to do personal favors, explaining that "[o]ur staff will be on duty from early in the morning through the post-dinner clean up."

83.     The 2021 camp was particularly tough on valets.  During the Summer Encampment, due to understaffing all three Plaintiffs allege they were working 16+ hours per day for the duration of the 14-day camp.

84.     Yet during this 2021 Summer Encampment, Plaintiffs reported exactly 8.0 hours per day on their timesheets, no overtime, and reported no more than 40 hours per week.  For example, Plaintiff Granger reported exactly 8.0 hours per day on July 5, 8, 9, 10, 11, 12, 14, 15, 16, 17, and 18.

85.     In 2021, each Plaintiff typically reported identical start times as each other, exactly 60-minute lunch times, and the same end time each day.

86.     On June 8, 2022, Ms. Talmor made a rare visit to the Bohemian Grove.  Surprised by the visit, a class member was sent to hide from Pomella LLC owner Talmor because they did not want her to find out the Plaintiff Saad was still working Monastery Camp and thus receiving 100% of his pay under-the-table.  Monastery Camp feared the Ms. Talmor would discover this off-the-clock

work and realize that valets were working without any worker's compensation coverage.

87.    Plaintiffs allege that Defendants' deliberate understaffing led to a constant, non-stop workload and prevented valets from having the ability to take meal periods or rest breaks.

88.    In 2022, despite multiple warnings from Plaintiff Gregg, Defendants remained understaffed and overworked.  For example, for the Spring Jinx "Burgundy Lunch" on June 9, 2023, four valets worked nonstop for approximately 18 hours providing a two-course lunch and dinner to 90 guests.

89.    Plaintiffs allege that Defendants' corporate policies, procedures, and uniform understaffing, were either written or institutionalized into each Defendant's labor practices, such that Plaintiffs and the class they seek to represent were not able to, or permitted to, take timely rest breaks or lunch periods, pursuant to the Labor Code, Industrial Welfare Commission Wage Order 5-2001, and other applicable Wage Orders.

90.    Plaintiffs allege Defendants implemented and maintained a policy to pay non-exempt valets less than the applicable minimum wage by failing to pay valets for all hours worked.  Defendants were aware of the fact that under their system, Plaintiffs regularly worked unpaid hours and/or worked for compensation at less than the applicable minimum wage.

91.    Plaintiffs allege Defendants also failed to provide overtime wages earned for all hours worked by Plaintiffs in excess of eight hours per day and/or forty hours per week.  If any overtime compensation was received, it was for fewer than actual overtime hours worked.

92.    Plaintiffs allege that in order to meet Defendants' workload requirements, they typically worked through both meal periods and rest breaks.

93.    Plaintiffs allege Defendants also failed to provide Plaintiffs with all the required meal periods when they worked more than five hours in a day; and Defendants failed to pay Plaintiffs a one-hour premium wage in lieu thereof.

94.    Plaintiffs allege Defendants failed to provide Plaintiffs and class members with timely and accurate wage statements.

95.    Plaintiffs allege Defendants did not maintain adequate records pertaining to when Plaintiffs began and finished each work period; meal/rest breaks; hours worked per day; hours worked per pay period; and applicable rates of pay for all regular hours and overtime.

96.    Plaintiffs allege that Defendants have maintained and continue to maintain uniform practices and procedures which are inconsistent with state and federal law.

97.    Plaintiffs allege that Defendants engage in uniform policies and conduct, as alleged herein resulting in violations of Labor Code §§ 201, 202, 203, 204, 226, 226.7, 510, 1194, and 2750.5.

98.    Plaintiffs bring this action pursuant to Business and Professions Code §§ 17200-17208, seeking injunctive relief and restitution of all benefits obtained by Defendants by engaging in the unlawful conduct complained herein.

99.    Defendants' valets do not/did not receive meal breaks, or rest breaks as required by the California Labor Code and Wage Order No. 5.

100.    Defendants' valets did not receive accurate wage statements.

101.    Plaintiffs' counsel served by email and certified mail requests for employment records for Plaintiffs pursuant to California Labor Code section 226.

102.    Plaintiffs Anthony Gregg, Shawn Granger, and Wallid Saad filed a Private Attorney General Act ("PAGA") Notice with the California Labor and Workforce Development Agency (LWDA), and served a copy on Defendants Bohemian Club, Monastery Camp, and Pomella LLC by certified U.S. Mail.

**V.**

**<u>CLASS ALLEGATIONS</u>**

103.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of all persons similarly situated, ("the class") as alleged herein.  This action is brought and may properly be maintained as a class action pursuant to the

provisions of California Code of Civil Procedure section 382, Federal Rule 23, and other applicable law pertaining to class actions.

104.   The proposed class Plaintiffs seek to represent is presently defined as follows:

**Proposed Class:**

All of the current and former "valets" and other workers that provided food/drink/hospitality services for the Bohemian Grove camps that did not use Bolt Staffing, within the four years prior to the date of the filing of this Complaint through the date of the final disposition of this action.

105.   Plaintiffs are all members of the proposed class.

106.   There is a well-defined community of interest in the litigation and the class is ascertainable.

A.   **Numerosity**: The class is so numerous that individual joinder of all members is impractical under the circumstances of this case.  While the exact number of class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe and thereon allege that the class consists of at least 300 persons or more.

B.   **Common Questions Predominate**:  Common questions of law and fact exist as to all class members, and predominate over any questions that affect only individual members of the class.  The common questions of law and fact include, but are not limited to:

i. What were and are the policies, programs, practices, procedures and protocols of Defendants regarding class members' actual work and tasks, and their job duties irrespective of job titles;

ii. Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding rest periods for class members;

iii. Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding lunch breaks for class members;

iv. What were and are the policies, programs, practices, procedures and protocols of Defendants regarding furnishing to the class members, upon each payment of wages, itemized statements required by Labor Code section 226;

v. Whether Defendants violated California law by their policies, programs, practices, procedures and protocols regarding furnishing to the class members, upon each payment of wages, itemized statements required by Labor Code section 226;

vi. Whether Defendants violated Business & Professions Code sections 17200 *et seq.* by their policies, programs, practices, procedures and conduct referred to in this cause of action;

vii.  Whether Defendants obtained voluntarily waivers with consent and full disclosure, and whether a written signed waiver is effective as to all future meal and rest periods;

viii.  The proper measure of damages sustained and the proper measure of restitution recoverable by members of the California class; and,

ix.  Additional common questions of law and fact may develop as the litigation progresses.

C.    **Typicality**: Plaintiffs' claims are typical of the claims of the class. Plaintiffs and other class members sustained losses, injuries and damages arising out of the Defendants' common policies, programs, practices, procedures, and course of conduct referred to in each cause of action and throughout this Complaint, which were applied uniformly to class members as well as Plaintiffs. Plaintiffs seek recoveries for the same types of losses, injuries, and damages as were suffered by the other class members as well as Plaintiffs.

D.    **Adequacy**: Plaintiffs and their counsel will fairly and adequately protect the interests of the class.  Plaintiffs have no interest that is adverse to the interests of the other class members.

E.    **Superiority**:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all class members is impractical.  Class action treatment will permit a large number

of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Also, because the losses, injuries and damages suffered by each of the individual class members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public of adjudication of individual litigation and claims would be substantial, and substantially more than if the claims are treated as class action. Individual litigation and claims would also present the potential for inconsistent or contradictory results.

       F. **Public Policy Considerations**: Defendants and other employers throughout the state violate wage and hour laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are often fearful of bringing claims because doing so can harm their employment and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity that allows for vindication of their rights while eliminating these risks, or at least enormously reducing them.

# VI.

## CAUSES OF ACTION

### First Cause of Action

**Failure to Pay Minimum Wage**
**(Labor Code §§ 1182.12, 1194, 1197 and 1197.1, IWC Wage Orders, and**
**the Fair Labor Standards Act 29 U.S.C. 201, et seq.)**

107.   Plaintiffs incorporate all previous paragraphs of this Complaint as though fully set forth herein.

108.   At all relevant times, the Industrial Welfare Commission (IWC) Wage Orders contained in Title 8 of the Code of Regulations ("Wage Orders") applied to Plaintiffs and other class members in their capacity as employees of Defendants.  The Wage Orders and California law provided, among other things, that employees must receive minimum wage earnings for all hours worked.

109.   Plaintiffs allege Defendants implemented and maintained policies to pay Plaintiff valets and class members less than the applicable minimum wage by failing to pay valets for hours worked.

110.   All Defendants were aware of the fact that under their system, Plaintiffs regularly worked unpaid hours and/or worked for compensation at less than the applicable minimum wage.

111.   During the liability period, Defendants have routinely failed to pay Plaintiffs the minimum wage required under California and federal law.

Plaintiffs' timecards and pay stubs did not list their actual regular and overtime hours worked.

112.    Plaintiffs were directed by Defendant Bohemian Club's Treasurer Dawson to submit false timesheets to Pomella LLC showing 8.0 "regular" hours, but to not include any overtime.  These timesheets nearly always listed exactly 8.0 hours per day for 5 days a week.

113.    Plaintiffs allege Defendants also failed to provide overtime wages earned for all hours worked by Plaintiffs in excess of eight hours per day and/or forty hours per week.  Where overtime compensation was received at all, it was for fewer than actual overtime hours worked and was paid at less than the amount required by California law.

114.    Defendant Bohemian Club's camp captains, members, and guests are aware that valets are working essentially nonstop for 15 to 18 hours at a time.

115.    Due to pent up demand, after the 2020 encampment was cancelled due to Covid-19, the 2021 camp was particularly difficult on Plaintiffs and other class members.

116.    During the 2021 Summer Encampment event, due to understaffing all three Plaintiffs allege they were working 16+ hours per day for the duration of the 14-day Summer Encampment.

117.    Defendants' camp valets fit into two categories (camps using "Bolt Staffing" and camps utilizing another catering/hospitality service).  Defendant Bohemian Club is aware that many camps do not use Bolt Staffing and have extra requirement for camps not using Bolt Staffing.  Bohemian Club exercises greater control over essential terms and conditions of employment for the camps choosing not to use Bolt Staffing.

118.    Plaintiffs allege on information and belief that camps not using Bolt Staffing dealt with the same off-the-clock work requirements and would be commonly be paid under-the-table by their camps.

119.    Plaintiffs allege on information and belief that other non-Bolt Staffing class members are working large amounts of unpaid hours each day. Plaintiffs typically reported exactly 8.0 hours per day on their timesheets, no overtime, and reported no more than 40 hours per week.

120.    Plaintiffs were told by Defendants' Camp Captains not to record their actual hours work, but to only report 8 hours per day, up to a maximum of 40 hours per week on their timesheets for Defendant Pomella LLC.

121.    Plaintiffs would then be paid under-the-table from Defendant Monastery Camp for part of the remainder of their owned wages.

122.    Labor Code Section 1194 provides in pertinent part: "any employee receiving less than the legal minimum wage or the legal overtime compensation

applicable to the employee is entitled to recover in a civil action the unpaid

balance of the full amount of this minimum wage or overtime compensation,

including interest thereon, reasonable attorney's fees, and costs of suit."

123.    Labor Code Section 1197 provides that the "minimum wage for

employees fixed by the commission or by any applicable state or local law, is the

minimum wage to be paid to employees, and the payment of a lower wage than

the minimum so fixed is unlawful."

124.    Defendants violated California Labor Code sections 1182.12, 1194,

1197, 1197.1 and the applicable Wage Order, Wage Order No. 5, by willfully

failing to pay all minimum wages due to Plaintiffs and the class members.

125.    Plaintiffs and the class members seek all actual, consequential and

incidental losses and damages, including, unpaid minimum wages, interest

thereon, attorneys' fees, and costs.

126.    In addition to the above-amounts, Plaintiffs and the class  they seek

to represent will seek to recover one hundred dollars ($100) for each underpaid

employee for each pay period for which the employee is underpaid for any initial

violation that is intentionally committed,  and two hundred fifty dollars ($250) for

each subsequent violation for the same specific offense, for each underpaid

employee for each pay period for which the employee is underpaid regardless of

whether the initial violation is intentionally committed.

## **Second Cause of Action**

### **Violations of the Fair Labor Standards Act**
### **("FLSA," 29 U.S.C. 201, *et seq*.)**

127.    Plaintiffs incorporate all paragraphs of this Complaint as though fully set forth herein.

128.    Plaintiffs are informed and believe, and thereon alleges, that Defendants have required collective class members, as part of their employment, to work without receiving the minimum wage for all hours worked, under 29 U.S.C. § 206(a).  That section provides the following: "Every employer shall pay to each of their employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [minimum wage]."

129.    Plaintiffs are informed and believe, and thereon alleges that Defendants have required, or require collective class members, as part of their employment, to work without compensation.

130.    Plaintiffs allege Defendants implemented and maintained policies to pay non-exempt valets less than the applicable minimum wage by failing to pay valets for hours worked.

131.   All Defendants were aware of the fact that under their system, Plaintiffs regularly worked unpaid hours and/or worked for compensation at less than the applicable minimum wage.

132.   During the liability period, Defendants have routinely failed to pay Plaintiffs the minimum wage required under California and federal law. Plaintiffs' timecards and pay stubs did not list their actual regular and overtime hours worked.

133.   Plaintiffs were directed by Defendant Bohemian Club's Treasurer Dawson to submit false timesheets to Pomella LLC showing 8.0 "regular" hours, but to not include any overtime.  These timesheets nearly always listed exactly 8.0 hours per day for 5 days a week.

134.   Plaintiffs allege Defendants also failed to provide overtime wages earned for all hours worked by Plaintiffs in excess of eight hours per day and/or forty hours per week.  Where overtime compensation was received at all, it was for fewer than actual overtime hours worked and was paid at less than the amount required by California law.

135.   Defendant Bohemian Club's camp captains, members, and guests were aware that class members are working essentially nonstop for 15 to 18 hours at a time.

136.   Due to pent up demand, after the 2020 encampment was cancelled due to Covid-19, the 2021 camp was particularly difficult on Plaintiffs and other class members.

137.   During the 2021 Summer Encampment event, due to understaffing all three Plaintiffs allege they were working 16+ hours per day for the duration of the 14-day Summer Encampment.

138.   Defendants' camp valets fit into two categories (camps using "Bolt Staffing" and camps utilizing another catering/hospitality service).  Defendant Bohemian Club is aware that many camps do not use Bolt Staffing and have extra requirement for camps not using Bolt Staffing.  Bohemian Club exercises greater control over essential terms and conditions of employment for the camps choosing not to use Bolt Staffing.

139.   Plaintiffs allege on information and belief that camps not using Bolt Staffing dealt with the same off-the-clock work requirements and would be commonly be paid under-the-table by their camps.

140.   Plaintiffs allege on information and belief that other non-Bolt Staffing valets are working large amounts of unpaid hours each day.  Plaintiffs typically reported exactly 8.0 hours per day on their timesheets, no overtime, and reported no more than 40 hours per week.

141.    Plaintiffs were told by Defendants' Camp Captains not to record their actual hours work, but to only report 8 hours per day, up to a maximum of 40 hours per week on their timesheets for Defendant Pomella LLC.

142.    Plaintiffs would then be paid under-the-table from Defendant Monastery Camp for part of the remainder of their owned wages.

143.    Plaintiffs allege that Defendants systematically violates the Fair Labor Standards Act by failing to provide Plaintiffs and other class members with minimum wage for all hours worked.

144.    Defendants' violations of the FLSA were willful and are ongoing.

145.    Plaintiffs propose to undertake appropriate proceedings to have the collective class members aggrieved by Defendants' unlawful conduct notified of the pendency of this action and given the opportunity to join this action as Plaintiffs, pursuant to 29 U.S.C. § 216(b), by filing written consents / joinders with the Court.

146.    Attached hereto as **Exhibit A** are Plaintiffs signed Fair Labor Standard Act Consent to Join forms for this collective action.

147.    As a result of Defendants' unlawful conduct, Plaintiffs and the collective class members have suffered damages as set forth herein.

148.    As a result of the foregoing, Plaintiffs seek judgment against Defendants on their own behalf, and on behalf of those collective class members

similarly situated who file written consents to join in this action, for all unpaid

wages owed by Defendants to Plaintiffs and the collective class members,

pursuant to 29 U.S.C. §§ 206 and 207, together with an award of an additional

equal amount as liquidated damages, and costs, interests, and reasonable

attorneys' fees, pursuant to, *inter alia*, 29 U.S.C. § 216(b).

## **Third Cause of Action**

### **Failure to Provide Meal Periods**
### **(Labor Code §§ 226.7 and 512)**

149.    Plaintiffs incorporate all previous paragraphs of this Complaint as

though fully set forth herein.

150.    Throughout the period applicable to this cause of action, California

law, as set forth in relevant part by the Industrial Welfare Commission Wage

Order No. 5 at section (11), provided as follows:

> i.    No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes

. . .

> ii.     If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the meal period is not provided.

151.   Labor Code Section 512 states that an "employer may not employ an

employee for a work period of more than five hours per day without providing the

employee with a meal period of not less than 30 minutes" if and when such employees work more than 5 hours in any given workday.  Labor Code Section 512 further requires two 30 -minute duty-free meal periods when an employee works more than 10 hours in any given workday.

152.    Labor Code section 226.7 requires payment of one (1) hour of pay in lieu of each meal periods not provided by the employer.

153.    Throughout the period applicable to this cause of action, Defendants failed to consistently allow and provide one or more duty-free 30-minute meal periods in violation of Labor Code section 510 and Wage Order No. 5, as required by California law.

154.    Plaintiffs allege that Defendants' deliberate understaffing led to a constant, non-stop workload.

155.    Plaintiffs allege that the non-stop work prevented valets from having the ability to take meal periods or rest breaks.

156.    Despite multiple warnings from Plaintiffs, Defendants remained understaffed, and working abundant hours off-the-clock without meal periods or rest breaks.

157.    Plaintiffs allege that in order to meet Defendants' workload requirements, they typically worked through both meal periods and rest breaks.

158.   Plaintiffs allege Defendants also failed to provide Plaintiffs with all the required meal periods when they worked more than five hours in a day; and Defendants failed to pay Plaintiffs a one-hour premium wage in lieu thereof.

159.   Plaintiffs allege that Defendants' corporate policies, procedures, and uniform understaffing, were either written or institutionalized into each Defendant's labor practices, such that Plaintiffs and the class they seek to represent were not able to, or permitted to, take timely rest breaks or lunch periods, pursuant to the Labor Code, Industrial Welfare Commission Wage Order 5-2001, and other applicable Wage Orders.

160.   Plaintiffs allege Defendants implemented and maintained a policy to pay non-exempt valets less than the applicable minimum wage by failing to pay valets for all hours worked.  Defendants were aware of the fact that under their system, Plaintiffs regularly worked unpaid hours and/or worked for compensation at less than the applicable minimum wage.

161.   Plaintiffs allege Defendants also failed to provide overtime wages earned for all hours worked by Plaintiffs in excess of eight hours per day and/or forty hours per week.  Where overtime compensation was received at all, it was for fewer than actual overtime hours worked and was paid at less than the amount required by California law.

162.    By virtue of this unlawful conduct, Plaintiffs and the class members are entitled to compensation as stated above, plus interest, attorneys' fees, costs and other applicable relief.

163.    Throughout the period applicable to this cause of action, Defendants required Plaintiffs and the class members to work during meal periods mandated by the applicable orders of the Industrial Welfare Commission.  Therefore, Plaintiffs and the class members are entitled to be paid as stated in Labor Code section 226.7, plus interest, attorneys' fees, costs and other applicable relief.

164.    On information and belief, Plaintiffs allege that the class members did not voluntarily or willfully waive rest and/or meal periods and were regularly required to work through meal periods.  Defendants failed to meet the requirements for lawful on-duty meal periods and/or instituted a course of conduct that created a working environment in which non-exempt employees were incapable of taking rest and/or meal periods.  As such, non-exempt employees were intimidated or coerced into waiving meal periods, and any written waivers were obtained without full disclosure and are thus involuntarily and without consent.

165.    Plaintiffs and the class they seek to represent request relief as described herein.

## Fourth Cause of Action

### Failure to Provide Rest Breaks
### (Labor Code §§ 226.7 and 512)

166.    Plaintiffs incorporate all previous paragraphs of this Complaint as though fully set forth herein.

167.    Wage Order No. 5, Section 12, requires each employer to provide each of its employees with at least one rest period of 10-minutes rest time for each 4 hours, or major fraction thereof, that each such employee works during each workday.

168.    Plaintiffs allege that Defendants' deliberate understaffing led to a constant, non-stop workload.

169.    Plaintiffs allege that the non-stop work prevented valets from having the ability to take meal periods or rest breaks.

170.    Despite multiple warnings from Plaintiffs, Defendants remained understaffed, and working abundant hours off-the-clock without meal periods or rest breaks.

171.    Plaintiffs allege that in order to meet Defendants' workload requirements, they typically worked through both meal periods and rest breaks.

172.    Plaintiffs allege Defendants also failed to provide Plaintiffs with all the required meal periods when they worked more than five hours in a day; and Defendants failed to pay Plaintiffs a one-hour premium wage in lieu thereof.

173.   Labor Code Section 226.7 provides that if an employer fails to provide an employee with a rest period in accordance with Wage Order No. 5, the employer must pay such employee(s) one additional hour of pay at the employee's regular rate of pay for each day that such a rest period was not provided.

174.   By their failure to provide rest periods for every four (4) hours or major fraction thereof worked per workday by Plaintiffs and class members, and failing to provide one (1) hour's pay in lieu thereof, as alleged above and herein, Defendants willfully violated the provisions of Labor Code sections 226.7 and IWC Wage Orders at section (12).

175.   By failing to keep adequate time records required by sections 226 and 1174(d) of the Labor Code and IWC Wage Order at section (7), Defendants have injured Plaintiffs and class members, and made it difficult to calculate the unpaid rest and meal period compensation due Plaintiffs and members of the class.  On information and belief, Plaintiffs allege that Defendants' failure to maintain accurate records was willful.

176.   As a result of the unlawful acts of Defendants, Plaintiffs and the class members they seek to represent have been deprived of premium wages in amounts to be determined at trial, and are entitled to an accounting and recovery

of such amounts, plus interest and penalties thereon, attorneys' fees, and costs, under the Labor Code and the applicable IWC Wage Orders.

## Fifth Cause of Action

### Failure to Pay All Wages at Termination
### (Labor Code §§ 201- 203)

177.   Plaintiffs incorporate all previous paragraphs of this Complaint as though fully set forth herein.

178.   Plaintiffs and many of the other class members quit or were discharged from their employment within the statute of limitations period applicable to this cause of action.

179.   Defendants failed to pay said employees, without abatement, all wages (as defined by applicable California law) within the time required by applicable California law.  Defendants' failure to pay said wages within the required time was willful within the meaning of Labor Code section 203.

180.   As of the filing of the Complaint, Defendants failed to timely pay wages due, and Plaintiffs and class members are owed penalties pursuant to Labor Code sections 201, 202, and 203.

181.   Therefore, each of these employees is entitled to one day's wages for each day he or she was not timely paid all said wages due, up to a maximum of thirty days' wages for each employee.  Because employees were never paid the

wages to which they were entitled, each employee is entitled to thirty days'
wages.

## Sixth Cause of Action

### Failure to Provide Accurate Wage Statements
### (Labor Code §§ 226(b), 1174, 1175)

182.  Plaintiffs incorporate all previous paragraphs of this Complaint as
though fully set forth herein.

183.  Labor Code section 1174(d) requires that every employee maintain
"payroll records showing the hours worked daily by and the wages paid to, and
the number of piece-rate units earned by and any applicable piece rate aid to,
employees employed" in California.

184.  Wage Order No. 5, Section 7 requires every employer in California
to "keep accurate information with respect to each employee including," . . .
"[t]ime records showing when the employee begins and ends each work period.
Meal periods, split shift intervals and total daily hours worked shall also be
recorded."

185.  Plaintiffs typically reported intentionally false, but identical start
times as each other, exactly 60-minute lunch times, and the same end time each
day.

186.  Defendant Monastery Camp worked with Defendant Pomella LLC to
operate two separate methods of paying employees.

187.   Plaintiffs were directed by Defendant Bohemian Club's Treasurer Dawson to submit false timesheets to Pomella LLC showing 8.0 "regular" hours, but to not include any overtime.  These timesheets nearly always listed exactly 8.0 hours per day for 5 days a week.

188.   Defendant Pomella LLC provides valets to Defendant Monastery Camp, the Silverado Squatters Camp, and possibly other Bohemian Grove camps.

189.   Defendant Pomella LLC was aware that the timesheets radically understate Plaintiffs' actual hours worked.

190.   Plaintiffs worked unpaid hours for Defendants as a part of systematic pattern of Defendants' failing to pay employees for all hours worked.

191.   Plaintiffs are informed and believe and upon that basis allege, that Defendants have failed to maintain accurate records in compliance with Labor Code section 1174 and/or Wage Order No. 5 for Plaintiffs and the class.  Pursuant to Labor Code Section 1174.5, Plaintiffs and the class are entitled to each collect a civil penalty from Defendants in the amount of $500.

192.   Plaintiffs' wages statement did not list their actual regular and overtime hours worked.

193.   Plaintiffs allege Defendants implemented and maintained policies to pay non-exempt valets less than the applicable minimum wage by failing to pay valets for hours worked.  All Defendants were aware of the fact that under their

system, Plaintiffs regularly worked unpaid hours and/or worked for compensation at less than the applicable minimum wage.

194.    During the liability period, Defendants have routinely failed to pay Plaintiffs the minimum wage required under California and federal law.

195.    Labor Code section 226 requires each employer to furnish accurate itemized wage statements at the time of payment reflecting (1) the gross wages earned, (2) the total hours worked, except for those whose compensation is based solely on a salary and who is exempt, (3) the number of piece-rate units earned and any applicable piece-rate if the employee is paid on a piece-rate basis, (4) all deductions, (5) net wages earned, (6) the dates of the period for which the employee is paid, (7) the name of the employee and last four digits of the employee's social security number or identification number, (8) the name and address of the legal entity that is the employer , and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

196.    Throughout the period applicable to this cause of action, Defendants intentionally failed to furnish to Plaintiffs and the class members, upon each payment of wages, itemized statements accurately showing, among other matters: total hours worked, the applicable hourly rates in effect during the pay period, and the corresponding number of hours worked at each hourly rate.

197.    Plaintiffs and the class members were damaged by these failures because, among other things, the failures led them to believe that they were not entitled to be paid, even though they were so entitled, and because the failures hindered them from determining the amounts of wages owed to them.

198.    Plaintiffs and the class members are entitled to the amounts provided for in Labor Code section 226(e), which provides for each employee to recover from Defendants fifty dollars ($50) for the initial pay period in which a violation occurred, and one-hundred dollars ($100) per class member for each violation in a subsequent pay period, not to exceed an aggregate penalty of $4,000 per class member.

199.    Plaintiffs and the class members are entitled to an award of attorney fees plus costs.

## Seventh Cause of Action

### Violation of Unfair Competition Law
### (Bus. and Prof. Code § 17200 *et seq.*)

200.    Plaintiffs incorporate all previous paragraphs of this Complaint as though fully set forth herein.

201.    Plaintiffs bring this action on behalf of themselves and the general public, including the class, pursuant to Business and Professions Code sections 17200 *et seq.*  Defendants' conduct alleged above constitutes unlawful business acts and practices in violation of Business & Professions Code sections 17200 *et*

*seq.* Defendants engaged in unfair competition in violation of the UCL by violating, *inter alia,* each of the following laws, Labor Code sections 201, 202, 203, 226, 226.7, 226.8, 510, 512, 1174, 1175, 1182.12, 1194, 1197, 1197.1, 1198, 1199, and 2802, and applicable Wage Orders, including Wage Order No. 5.

202.    Defendants' course of conduct, acts, and practices in violation of the California laws mentioned in the above paragraph constitute a separate and independent violation of the UCL. Defendants' conduct described herein violates the policy or spirit of such laws or otherwise significantly threatens or harms competition.  The harm to Plaintiffs and the class members in being wrongfully denied lawfully earned wages outweighs the utility, if any, of Defendants' policies or practices and, therefore, Defendants' actions described herein constitute an unfair business practice or act within the meaning of the UCL.

203.    The unlawful and unfair business practices and acts of Defendants, and each of them, described above, have injured the class members in that they were wrongfully denied the payment of earned wages.

204.    Plaintiffs, on behalf of themselves and the class, seeks restitution in the amount of the respective unpaid wages earned and due at a rate not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a work week, or eight hours in a day, and double the regular rate of pay for work performed in excess of twelve hours per day and such other legal

and equitable relief from Defendants' unlawful and willful conduct as the Court deems just and proper.

205.   Pursuant to Business and Professions Code sections 17200 *et seq.*, for the statute of limitations period covered by this cause of action, Plaintiffs and the class members are entitled to restitution for at least the following:  the unpaid withheld and retained by Defendants referred to above.

206.   Plaintiffs, the class members, and the general public are also entitled to permanent injunctive and declaratory relief prohibiting Defendants from engaging in the violations and other misconduct referred to above.

207.   Defendants are also liable to pay attorneys' fees pursuant to California Code of Civil Procedure section 1021.5 and other applicable law, and costs.  The Plaintiffs, on behalf of themselves and all class members, also seek recovery of attorneys' fees and costs of this action to be paid by Defendant, as provided by the UCL and California Labor Code §§ 218, 218.5, and 1194.

## Eight Cause of Action

### Violation of Labor Code Section 2699
### (California Private Attorney General Act ("PAGA"))

208.   Plaintiffs, on behalf of themselves and other aggrieved employees, incorporate all previous paragraphs of this Complaint as though fully set forth herein.

209.   Plaintiffs filed a Private Attorney General Act ("PAGA") complaint online with the California's Labor and Workforce Development Agency (LWDA) on approximately April 25, 2023, and served Defendants Bohemian Club, Monastery Camp, and Pomella LLC. by certified mail as prescribed by the Labor Code.

210.   California IWC Wage Orders requires an employer to pay each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise.

211.   Defendants failed to pay Plaintiffs and other aggrieve employees at least minimum wage for all hours worked in violation of Labor Code sections 1194 and 1197.

212.   During the liability period, Defendants have routinely failed to pay Plaintiffs the minimum wage required under California law.

213.   Plaintiffs, by virtue of their employment with Defendants are aggrieved employees with standing to bring an action under PAGA.  Plaintiffs have satisfied all prerequisites to serve as a representative of the general public to enforce California's labor laws, including, without limitation, the penalty provisions identified in Labor Code section 2699.5.

214.   Since the LWDA took no steps within the time period required to intervene and because Defendants took no corrective action to remedy the allegations set forth above, Plaintiffs as representatives of the people of the State of California, seeks any and all penalties otherwise capable of being collected by the Labor Commission and/or the Department of Labor Standards Enforcement ("DLSE").  This includes each of the following, as set forth in Labor Code Section 2699.5, which provides that Section 2699.3(a) applies to any alleged violation of the following provisions: Sections 558, 1194, 1197, 1197.1, and 1199.

215.   Labor Code section 2699 provides for civil penalties of $100 per employee per pay period for the initial violation and $200 per employee per pay period for each subsequent violation.

216.   Plaintiffs, as representatives of the general public, seek to recover any and all penalties for each and every violation shown to exist or to have occurred during the one-year period before Plaintiffs filed Notice with the LWDA of their intent to bring this action, in an amount according to proof, as to those penalties that are otherwise only available to public agency enforcement actions. Funds recovered will be distributed in accordance with the PAGA, with at least 75% of the penalties recovered being reimbursed to the State of California and the LWDA.

217.   As a result of the acts alleged above, Plaintiffs and the class they seek to represent seek penalties under Labor Code §§ 201-203, 212, 226, 226.7, 510, 1182.12, 1194, 1197, and 1197.1.

218.   Plaintiffs, as representatives of the general public, seeks to recover reasonable attorney's fees and costs under PAGA, Labor Code section 2699(g)(1).

219.   WHEREFORE, Plaintiffs and the class they seek to represent request relief as described herein and below, and as the Court may deem proper.

## VII.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and all members of the class, pray for relief as follows:

1.     That the Court determine that this action may be maintained as a class action;

2.     That Plaintiffs be appointed the representatives of the proposed class;

3.     That the attorneys of record for Plaintiffs whose names appear in this Complaint be appointed class counsel;

4.     For civil penalties pursuant to Labor Code Sections 226(e), 226.8(b), 226.8(c), 1174.5, and 1197.1;

5.      For compensatory damages representing the amount of unpaid wages owed to Plaintiffs and the class members;

6.      For compensatory damages pursuant to Labor Code Section 226.7 for missed meal and rest breaks;

7.      For compensatory damages pursuant to Labor Code Section 2802;

8.      For reasonable attorneys' fees and costs pursuant to Labor Code Sections 226(e), 1194, and 2802(c);

9.      For such general and special damages as may be appropriate;

10.     For liquidated damages as authorized pursuant to Labor Code Sections 1194.2;

11.     For waiting time penalties and civil penalties for all class members no longer in Defendants' employ at the time of Judgment;

12.     For pre-judgment interest;

13.     For restitution as described in the cause of action under Business & Professions Code §§ 17200 *et seq.* above;

14.     For permanent injunctive and declaratory relief described in the cause of action under Business & Professions Code §§ 17200 *et seq.* above;

15.     A declaratory judgment that the practices complained of herein are unlawful under California state law;

16.    Attorney's fees and costs of suit, including expert fees pursuant to California Labor Code §§218.5, 1194, and Code Civ. Proc. §1021.5; and

17.    Such other injunctive and equitable relief as the Court may deem proper.

**DATED:** June 5, 2023                              **NUNES LAW GROUP, APC**

*Tony Nunes*
_____
By:  Anthony J. Nunes, Esq.
Attorneys for Plaintiffs ANTHONY
GREGG, SHAWN CLAIBORNE, and
WALLID SAAD, on behalf of themselves
and all others similarly situated,